IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 18-cv-00108-PAB-KLM

ARCTIC ENERGY SERVICES, LLC,

    Plaintiff,

v.

DUSTIN NEAL,
DUSTIN AILPORT, and
WATER WAY SOLUTIONS, LLC,

    Defendants.

---

## PRELIMINARY INJUNCTION

---

This matter is before the Court on Plaintiff's Motion for a Preliminary Injunction [Docket No. 11]. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367. On February 20, 2018, the Court held a hearing on plaintiff's motion. At the hearing, the Court made findings of fact that are incorporated herein by reference. *See* Docket No. 44 at 3.

Plaintiff Arctic Energy Services, LLC is in the business of providing various services to oil and gas companies, including flow back, production well testing, water transfer services, and equipment rentals. Docket No. 1 at 2, ¶ 4. On January 12, 2018, plaintiff filed a complaint asserting nine claims for relief. Docket No. 1. Plaintiff's first and second claims for relief allege that defendants Dustin Ailport, Dustin Neal, and Water Way Solutions, LLC violated the federal Defendant Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839(3) and the Colorado Uniform Trade Secrets Act ("CUTSA"), Colo.

Rev. Stat. § 7-74-101 *et seq.*[1] by unlawfully acquiring and using plaintiff's trade secrets. Docket No. 1 at 23-27. On January 19, 2018, plaintiff filed a motion for a preliminary injunction seeking to enjoin defendants from: (1) disclosing, using, and/or otherwise making publicly available any documents and information they obtained as a result of their employment with plaintiff; (2) destroying, erasing, or otherwise making unavailable any evidence concerning the events alleged in the complaint; and (3) accepting any business from a customer who was a customer of plaintiff during Mr. Neal's and Mr. Ailport's employment with plaintiff. Docket No. 11-1 at 1-2.

To succeed on a motion for a preliminary injunction, the moving party must show (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)); *see Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010)). "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)) (internal quotation marks omitted). Granting such "drastic relief," *United States ex rel. Citizen Band Potawatomi*

---

[1] The Court notes that certain employment and confidentiality agreements signed by Mr. Ailport state that the terms of those agreements "shall be governed by, construed and enforced in accordance with" Wyoming law. Ex. 11 at 3. This raises the question of whether Wyoming law, rather than the CUTSA, governs Mr. Ailport's duties in regard to trade secrets. Defendants, however, do not challenge the applicability of the CUTSA.

*Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc.,* 883 F.2d 886, 888-89 (10th Cir. 1989), is the "exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

To prevail on a claim for misappropriation of trade secrets under Colorado law, a plaintiff must show: "(i) that he or she possessed a valid trade secret, (ii) that the trade secret was disclosed or used without consent, and (iii) that the defendant knew, or should have known, that the trade secret was acquired by improper means." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993). The CUTSA defines "trade secret" as "the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value." Colo. Rev. Stat. § 7-74-102(4). To constitute a trade secret, "the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes." *Id.*

Under Colorado law, "[w]hat constitutes a 'trade secret' is a question of fact for the trial court." *Doubleclick Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1257 (D. Colo. 2005). Courts look to several factors to make this determination, including:

> (1) the extent to which the information is known outside the business, (2) the extent to which it is known to those inside the business, *i.e.*, by the employees[,] (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information, (4) the savings effected and the value to the holder in having the information as against competitors, (5) the amount of effort or money expended in obtaining and developing the information, and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Id.* (internal quotation marks omitted).  The Tenth Circuit has held that, under Colorado law, "a trade secret can exist in a combination of characteristics, each of which, considered separately, is in the public domain, but, taken together, may yield a competitive advantage that results in a protectable trade secret."  *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1130 (10th Cir. 2003).

Similar to the requirements under Colorado law, a plaintiff asserting a claim for misappropriation of trade secrets under the DTSA must establish: (1) the existence of a trade secret that relates to a product or service used in, or intended for use in, interstate or foreign commerce; (2) the acquisition of the trade secret, or the use or disclosure of the trade secret without consent; and (3) the person acquiring, using, or disclosing the trade secret knew or had reason to know that the trade secret was acquired by improper means.  *See* 18 U.S.C. §1836(b)(1); 18 U.S.C. § 1839; *Ultradent Prods. Inc. v. Spectrum Solutions LLC*, 2018 WL 324868, at *2 (D. Utah Jan. 8, 2018); *Blue Star Land Servs. LLC v. Coleman*, 2017 WL 6210901, at *4 (W.D. Okla. Dec. 8, 2017).  Like the CUTSA, the DTSA defines "trade secret" broadly to include "all forms and types of financial, business, scientific, technical, economic, or engineering information" so long as "the owner thereof has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to," or ascertainable by, another person.  18 U.S.C. § 1839(3).

At the hearing, the Court found that plaintiff demonstrated a likelihood of success on the merits of its state and federal trade secrets claims.  The Court determined that the following information belonging to plaintiff constituted valid trade secrets: price lists,

4

quotes, invoices, and master service agreements. Andrea Moncayo, plaintiff's information technology manager, testified that plaintiff employed various measures to protect such information, including confidentiality warnings in company emails, employee nondisclosure agreements, restricted access to offices containing confidential information, and restricted access to confidential information on the company server. An Employee Confidentiality and Unfair Competition Agreement signed by Mr. Ailport in 2010 and submitted as plaintiff's Exhibit 10 provides that the "Employee shall treat as confidential and shall not, directly or indirectly, use, disseminate, disclose, publish, or otherwise make available to any person, firm, corporation, unincorporated association or other entity any Confidential and Proprietary Information." The agreement defines "Confidential and Proprietary Information" as "any and all information disclosed or made available to the Employee or known by the Employee as a direct or indirect consequence of or through his employment by the Company and not generally known in the industry . . . , including . . . customers and brokers, marketing plans, product development, plans, publications, equipment, and financial information." At the hearing, the Court found that price lists, quotes, invoices, and master service agreements derived independent economic value to Arctic from being kept secret. For example, Tracy Turner, Chief Executive Officer for Arctic, testified that a company's pricing information can be used by other companies to gain a competitive advantage in the bidding process. The Court also determined that the price lists, quotes, invoices, and master service agreements "relate[] to a product or service used in, or intended for use in, interstate or foreign commerce," 18 U.S.C. § 1836(b)(1), given Mr. Turner's testimony that Arctic operates in at least four states.

As to the second element of the trade secrets claims, the Court found that defendants acquired trade secrets belonging to plaintiff. At the hearing, Mr. Ailport testified that, following his separation from Arctic, he retained four flash drives that contained information downloaded from Arctic's computers. Defendants' Exhibit J4 showed that this information included customer price sheets and quotes. Plaintiff's Exhibit 15, which Ms. Moncayo testified was a screenshot of Mr. Ailport's office computer in Glenrock, Wyoming, showed a number of Arctic documents, including price sheets, quotes, and master service agreements, were moved or downloaded onto removable media. Regarding Mr. Neal, plaintiff introduced two exhibits – Exhibit 1 and Exhibit 16 – showing that (1) Mr. Neal, while still an employee of Arctic, sent a Great Western price sheet and a Synergy quote via his personal email account to Mr. Ailport after Mr. Ailport had left Arctic, and (2) Mr. Neal removed a number of files, including price sheets and customer quotes, from his Arctic One Drive account before leaving Arctic. Brandon Buckovich, who succeeded Mr. Neal as plaintiff's district manager for Colorado, testified that Mr. Neal took a flash drive that he said belonged to him on his last day of work for Arctic. The Court concludes from this evidence that Mr. Neal downloaded and retained confidential information belonging to Arctic immediately before he left Arctic.

Finally, the Court found that both Mr. Ailport and Mr. Neal knew that their acquisition of Arctic's trade secrets was improper. In making this finding as to Mr. Neal, the Court relied on Exhibit 1 and the testimony of Mr. Buckovich. Mr. Buckovich testified that, on the day Mr. Neal resigned, Mr. Neal referred Mr. Buckovich to another Arctic employee for information about customer price sheets. When Mr. Buckovich

talked to that employee, it turned out the employee knew nothing about the price sheets. Mr. Buckovich then looked for the price sheets on Arctic's server and discovered they were missing. The Court concludes from these facts that Mr. Neal was purposefully deceptive about his acquisition of plaintiff's price sheets.

As to Mr. Ailport, the Court found that he was aware of Arctic's policies concerning the return and nondisclosure of confidential information. Exhibits 10 through 12 show that Mr. Ailport signed various agreements containing confidentiality obligations that defined the types of information considered confidential. Mr. Ailport testified that he downloaded a number of Arctic files in November 2017 while attempting to copy personal files from his work computer. However, he also testified that he downloaded the Arctic files because he wanted to protect them from other employees in the building. Based on this testimony, the Court found that Mr. Ailport's downloading activities were not simply an attempt to preserve personal information, but rather an attempt to acquire Arctic documents for purposes of gaining a competitive advantage over Arctic. This conclusion was further supported by Exhibit 1, which shows that Mr. Ailport received confidential Arctic information from a current Arctic employee, Mr. Neal, following Mr. Ailport's separation from the company.

In addition to finding a likelihood of success on the merits, the Court found that plaintiff made a showing of irreparable harm. "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). Mr. Ailport testified that he plugged the flash drives containing Arctic files into his home computer and Microsoft Surface tablet to perform work. It is thus reasonable to infer that information from the flash drives was

7

transferred to Mr. Ailport's home devices.  Given Mr. Turner's testimony regarding the importance of pricing information to Arctic's ability to maintain its competitive advantage and Mr. Ailport's improper acquisition of plaintiff's confidential information, the Court found that the potential use of such information to compete against plaintiff constitutes irreparable harm.

The Court found that the balance of equities tips in favor of plaintiff.  Plaintiff has reason to expect that its employees will follow company policy in protecting its trade secrets.  By comparison, defendants do not have any legitimate interest in using improperly acquired confidential information.

Finally, the Court found that a limited preliminary injunction is in the public interest.  Public policy supports the protection of trade secrets, and there is no legitimate public interest in a company using confidential information to unfairly compete with another company.  As a result, the Court found that all four factors for issuance of a preliminary injunction weighed in favor of granting injunctive relief.

Pursuant to Fed. R. Civ. P. 65(c), the Court required that plaintiff post a $20,000.00 bond.

For the foregoing reasons and those stated in the Court's oral ruling, it is

**ORDERED** that Plaintiff's Motion for a Preliminary Injunction [Docket No. 11] is **GRANTED**.  It is further

**ORDERED** that defendants are enjoined from deleting, destroying, erasing, or otherwise making unavailable for further proceedings in this matter any business information of plaintiff that is in defendants' control, including any trade secrets,

proprietary information, and computer information. "Computer information" shall include, among other things, the four flash drives retained by Mr. Ailport and any devices that those flash drives were plugged into. It is further

**ORDERED** that defendants are enjoined from using, disclosing, or otherwise making publicly available for any purpose confidential information, in the form of price lists, quotes, invoices, and master service agreements, that they obtained as a result of Mr. Ailport's and Mr. Neal's employment with plaintiff. It is further

**ORDERED** that defendants are enjoined from soliciting any current client of plaintiff through the use of confidential information belonging to plaintiff. It is further

**ORDERED** that Mr. Ailport shall direct his New York counsel (1) to make exact copies of the four flash drives discussed in this order and (2) to provide those copies to his counsel in this case. Such copies shall include any metadata contained on the flash drives so that a forensic analysis can be performed. It is further

**ORDERED** that this order will remain in effect pending final disposition of plaintiff's lawsuit or further order of this Court.

DATED February 22, 2018.

BY THE COURT:

  s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge